**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 20, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

IN RE: UNIVERSAL SERVICE FUND
TELEPHONE BILLING PRACTICE
LITIGATION.

CLASS PLAINTIFFS,

       Plaintiffs,

CLASS PLAINTIFFS, Thomas F. Cummings;
Roger A. Gerdes; Sterling Beimfohr, doing
business as Sterling Sails,

       Plaintiffs - Appellees
       /Cross-Appellants,

    v.

AT&T CORPORATION,

       Defendant - Appellant
       /Cross-Appellee,

HARRIS, WILTSHIRE & GRANNIS LLP,

       Respondent,

   and

PAM HATTAWAY, formerly known as Pam
Holloway; GEORGE HATTAWAY; T. J.
ADAMCZYK,

       Objectors.

Nos. 09-3059 & 09-3077

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 2:02-MD-01468-JWL)**

David W. Carpenter (Mark B. Blocker and Michael Doss with him on the briefs), Sidley Austin LLP, Chicago, IL, for Defendant-Appellant/Cross-Appellee.

Barry Barnett of Susman Godfrey L.L.P., Dallas, TX, and F. Paul Bland, Jr., Public Justice, Washington, DC (Warren T. Burns of Susman Godfrey L.L.P., Dallas, TX, with them on the briefs), for Plaintiffs-Appellees/Cross-Appellants.

Before **MURPHY**, **HOLMES**, Circuit Judges, and **POLLAK**,[*] District Judge.

**MURPHY**, Circuit Judge.

## I. Introduction

This multidistrict litigation involves multiple class action lawsuits arising from the billing practices of defendant AT&T Corporation. Each class of plaintiffs challenged the lawfulness of a monthly line-item charge defendant imposed on its customers to recover contributions to the federal Universal Service Fund ("USF") required by 47 U.S.C. § 254. One subclass of plaintiffs, comprising all residential long-distance customers of AT&T in California, proceeded to trial and was awarded $16,881,000 in damages. The district court remitted the verdict to $10,931,000, and awarded prejudgment interest of $5,546,958.41, for a total award of $16,477,958.41. On appeal, AT&T argues it is entitled to judgment as a matter of law or a new trial. It alternatively asserts it

[*]Honorable Louis H. Pollak, U.S. District Court Judge, Eastern District of Pennsylvania, sitting by designation.

-2-

is entitled to a further remittitur of the jury's damages award. On cross-appeal, plaintiffs argue the district court erred in enforcing AT&T's arbitration clause against non-California residential plaintiffs and in granting partial summary judgment on AT&T's business customers' breach of contract claims. Exercising jurisdiction under 28 U.S.C. § 1291 and 9 U.S.C. § 16(a)(3), this court **AFFIRMS** the decisions of the district court.

## II. Background

Under the Federal Communications Act of 1934 ("FCA" or "1934 Act"), telecommunications carriers were required to file with the Federal Communications Commission ("FCC") a list of tariffs showing "all charges . . . and . . . the classifications, practices, and regulations affecting such charges." 47 U.S.C. § 203(a). The 1934 Act also prohibited carriers from extending rates, terms, or conditions that differed from their filed tariffs. 47 U.S.C. § 203(c); *AT&T v. Cent. Office Tel., Inc.*, 524 U.S. 214, 222 (1998). The goal of this "filed rate doctrine" was to ensure uniformity in the rates, terms, and conditions offered to the purchasers of telecommunications services. *Cent. Office Tel.*, 524 U.S. at 222-23.

During the 1970s and 1980s, advances in the telecommunications industry gradually eroded the utility of the filed rate doctrine. *Ting v. AT&T*, 319 F.3d 1126, 1131-32 (9th Cir. 2003). The FCC's attempts to exempt certain carriers from the requirements of § 203, however, were invalidated by the Supreme Court.

*MCI Telecomms. Corp. v. AT&T Corp.*, 512 U.S. 218, 225-29, 234 (1994) (holding § 203(b)(2) gives the FCC authority to modify the 1934 Act's tariff filing requirement, but not to eliminate it entirely).

Congress responded by enacting the Telecommunications Act of 1996 ("1996 Act"), which required the FCC to "forbear from applying" the filed rate doctrine if it determined application of the doctrine was: (1) "not necessary to ensure that the charges, practices, classifications, or regulations . . . are just and reasonable and are not unjustly or unreasonably discriminatory," (2) "not necessary for the protection of consumers," and (3) "consistent with the public interest." 47 U.S.C. § 160(a). The FCC subsequently issued a Notice of Proposed Rulemaking on March 25, 1996, to forbear from applying the tariffing requirements of § 203 of the 1934 Act. *In re Policy & Rules Concerning the Interstate, Interexchange Marketplace*, Notice of Proposed Rulemaking, 11 FCC Rcd. 7141 (1996). Following a comment period, the FCC issued a series of detariffing orders, effective August 1, 2001, in which it forbore from enforcing § 203 against long-distance carriers. *See In re Policy & Rules Concerning the Interstate, Interexchange Marketplace*, Second Order on Reconsideration, 14 FCC Rcd. 6004 (1999); *In re Policy & Rules Concerning the Interstate, Interexchange Marketplace*, Order on Reconsideration, 12 FCC Rcd. 15,014 (1997); *In re Policy & Rules Concerning the Interstate, Interexchange Marketplace*, Second Report & Order, 11 FCC Rcd. 20,730 (1996).

The FCC anticipated telecommunications carriers would enter into "short, standard-form contracts" with their customers setting forth the applicable rates, terms, and conditions of service which had previously been set out in the filed tariffs. *Second Report & Order*, 11 FCC Rcd. 20,730, ¶ 57. The FCC emphasized carriers would continue to be subject to the substantive prohibitions against unjust, unreasonable, and discriminatory rates and terms contained in §§ 201 and 202 of the 1934 Act. *Order on Reconsideration*, 12 FCC Rcd. 15,014, ¶ 77. Specifically, the FCC's *Order on Reconsideration* stated:

> In the *Second Report and Order*, we stated that our decision to forbear from requiring nondominant interexchange carriers to file tariffs for interstate, domestic, interexchange services will not affect our enforcement of carriers' obligations under sections 201 and 202 to charge rates, and impose practices, classifications, and regulations that are just and reasonable, and not unjustly or unreasonably discriminatory. We therefore agree with AT&T, Sprint, and WorldCom that the Communications Act continues to govern determinations as to whether rates, terms, and conditions for interstate, domestic, interexchange services are just and reasonable, and are not unjustly or unreasonably discriminatory. While the parties only sought clarification that the Communications Act governs the determination as to the lawfulness of rates, terms, and conditions, we note that the Communications Act does not govern other issues, such as contract formation and breach of contract, that arise in a detariffed environment. As stated in the *Second Report and Order*, consumers may have remedies under state consumer protection and contract laws as to issues regarding the legal relationship between the carrier and customer in a detariffed regime.

*Id.* (footnotes omitted).

To meet its obligations under the detariffing orders, AT&T mailed proposed Consumer Services Agreements ("CSAs") to each of its residential

customers in June 2001.  The CSAs and the accompanying mailings clearly informed AT&T's residential customers they could agree to the terms of the CSA by continuing to use, and pay for, AT&T services.  The CSAs provided "[y]ou agree to pay us for the Services at the prices and charges listed in the AT&T Service Guides"[1] and that "[y]ou must pay all taxes, fees, surcharges and other charges that we bill you for the Services."  The CSAs then provided "[t]his agreement incorporates by reference the prices, charges, terms and conditions included in the AT&T Service Guides."

The Consumer Service Guide described the AT&T Universal Connectivity Charge ("UCC") as "a monthly charge to Customers to recover amounts AT&T must pay into a federal program called the Universal Service Fund."[2]  The Consumer Service Guide then stated "[t]he Universal Connectivity Charge is equal to 9.9% of your total billed state-to-state and international charges

---

[1]There are two AT&T Service Guides relevant to this appeal: the Consumer Service Guide and the Business Service Guide.

[2]The UCC description, in its entirety, read:

> The AT&T Universal Connectivity Charge is a monthly charge to Customers to recover amounts AT&T must pay into a federal program called the Universal Service Fund (USF).  The USF helps provide affordable telecommunications services for low-income customers and customers in rural areas.  It also provides discounts on Internet access for eligible schools, libraries and rural health care providers.  AT&T will revise the Universal Connectivity Charge if the method and/or amount of its required contribution to the USF changes.

(excluding taxes)." AT&T issued a new guide in advance of each change to the UCC rate and always charged its customers exactly the rate listed in that guide.

The CSAs also contained an arbitration clause with a class action ban. This provision stated "[t]his section provides for resolution of disputes through final and binding arbitration before a neutral arbitrator instead of in a court by a judge or jury or through a class action." It added "[n]o dispute may be joined with another lawsuit, or in an arbitration with a dispute of any other person, or resolved on a class-wide basis."

AT&T used a different approach with its business customers, with whom it entered into individually negotiated agreements. Each agreement incorporated by reference the terms of AT&T's Business Service Guide, which contained the following provision governing regulatory surcharges and miscellaneous charges:

> AT&T may adjust its rates and charges or impose additional rates and charges on its Customers in order to recover amounts that it, either directly or indirectly, pays to or is required by governmental or quasi-governmental authorities to collect from others to support statutory or regulatory programs, plus associated administrative costs. Examples of such programs include, but are not limited to, the Universal Service Fund . . . .

The Business Service Guide then listed the UCC rate applicable to the business customers' interstate and international charges.

This multidistrict litigation originally involved numerous putative class action lawsuits against, inter alia, AT&T. On March 10, 2003, plaintiffs filed a second consolidated and amended class action complaint alleging, among other

things, violations of federal antitrust laws, 47 U.S.C. §§ 201(b) and 202, the New York and Kansas statutory consumer protection acts, and breach of contract. As relevant to this appeal, Plaintiff Thomas Cummings, a Pennsylvania resident, sought to represent a nationwide class of AT&T's residential customers. Plaintiff Sterling Beimfohr sought to represent a nationwide class of AT&T's business customers.

In October 2002, AT&T filed a motion to dismiss or compel arbitration of various claims, including Cummings's claims. The district court granted AT&T's motion to compel arbitration of Cummings's claims, holding the FCA preempted the argument that AT&T's arbitration clause was substantively unconscionable under state law. The district court also concluded the arbitration clause was not procedurally unconscionable. The district court, however, permitted AT&T's California residential customers' breach of contract claims to proceed based on the collateral estoppel effect of *Ting v. AT&T*, 182 F. Supp. 2d 902 (N.D. Cal. 2002), *aff'd*, 319 F.3d 1126 (9th Cir. 2003).

In December 2007, AT&T moved for summary judgment on the two remaining breach of contract claims in the case: (1) a breach of contract claim brought on behalf of AT&T's California residential customers; and (2) a breach of contract claim brought on behalf of AT&T's business customers. The class period for these breach of contract claims was August 1, 2001 to March 31, 2003. The district court granted AT&T's motion as to the breach of contract claim

brought on behalf of AT&T's business customers, but denied it as to the breach of contract claim brought on behalf of AT&T's California residential customers.

A jury trial ensued. The jury found in favor of the California residential customer plaintiffs on the breach of contract claim and awarded $16.881 million in damages against AT&T. Both parties filed post-trial motions. The court denied AT&T's motion for entry of judgment and for a new trial and granted in part and denied in part both AT&T's motion for a remittitur and plaintiffs' motion for prejudgment interest. The court reduced the verdict to $10,931,000, and awarded prejudgment interest of $5,546,958.41, for a total award of $16,477,958.41. The subclass of California residential customers accepted the remitted judgment, which the district court promptly entered, and AT&T filed a timely notice of appeal.

On appeal, AT&T argues it is entitled to a judgment as a matter of law on the California residential customers' breach of contract claims or to a new trial. In the alternative, AT&T argues it is entitled to further remittitur of the damages award. On cross-appeal, the plaintiffs argue the district court erred in enforcing AT&T's arbitration clause against the non-California residential plaintiffs, and that it erred in granting summary judgment on AT&T's business customers' breach of contract claims.

## III.  Analysis

### 1.  Preemption

The district court's order compelling arbitration is reviewable after final judgment.  9 U.S.C. § 16(a)(3); *Quinn v. CGR*, 828 F.2d 1463, 1466 (10th Cir. 1987).  This court reviews the order compelling arbitration de novo applying the same legal standard employed by the district court.  *Armijo v. Prudential Ins. Co. of Am.*, 72 F.3d 793, 796 (10th Cir. 1995).

The non-California residential plaintiffs argue the district court erred in concluding §§ 201 and 202 of the FCA preempt their state-law claims that the arbitration clauses in the CSAs should not be enforced due to their substantive unconscionability.  Federal preemption power is derived from the Supremacy Clause in Article VI of the United States Constitution.  *Choate v. Champion Home Builders Co.*, 222 F.3d 788, 791 (10th Cir. 2000).  Federal law preempts state law in three circumstances: (1) where a statute has an express preemption provision, (2) where Congress intends federal law to "occupy the field," and (3) "to the extent of any [state-law] conflict with a federal statute."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (quotation omitted).  The ultimate touchstone of the preemption analysis is congressional intent.  *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992).  Because §§ 201 and 202 of the FCA do not contain an express preemption provision, only field and conflict preemption are at issue in this case.

-10-

### a.     Field Preemption

AT&T contends the uniformity principle embodied in §§ 201 and 202 of the FCA sufficiently occupies the field to preempt all state-law regulation of long-distance contracts. *See Cipollone*, 505 U.S. at 516 (stating field preemption occurs when "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the states to supplement it" (quotations omitted)). The FCC's detariffing orders, however, explicitly contemplate a role for state law in the deregulated long-distance market. *See Order on Reconsideration*, 12 FCC Rcd. 15,014, at ¶ 77 ("[C]onsumers may have remedies under state consumer protection and contract laws as to issues regarding the legal relationship between the carrier and customer in a detariffed regime."). Accordingly, because state law expressly supplements federal law in the regulation of interstate telecommunications carriers, field preemption does not apply. *See also Ting*, 319 F.3d at 1136 ("[F]ield preemption is not an issue because state law unquestionably plays a role in the regulation of long distance contracts."); *Boomer v. AT&T Corp.*, 404, 424 (7th Cir. 2002) (indicating field preemption likely no longer applies after detariffing but not expressly resolving the issue).

### b.     Conflict Preemption

Plaintiffs argue the district court erred in concluding the non-California residential plaintiffs' substantive unconscionability claims were preempted

because they conflict with the uniformity principle incorporated in §§ 201 and 202 of the FCA. Conflict preemption occurs "where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Choate*, 222 F.3d at 792 (quotation omitted); *see also Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 489 (10th Cir. 1998) ("Conflict preemption requires that the state or local action be a material impediment to the federal action, or thwart[] the federal policy in a material way.").

There is a circuit split on whether the uniformity principle embodied in §§ 201 and 202 of the FCA has preemptive force in the wake of the FCC's detariffing orders. In *Boomer*, the Seventh Circuit held §§ 201 and 202 of the FCA preempt state substantive unconscionability challenges to the CSA's arbitration clause. 309 F.3d at 418. *Boomer* reasoned §§ 201 and 202, "read together, demonstrate a congressional intent that individual long-distance customers throughout the United States receive uniform rates, terms and conditions of service." *Id.* In arriving at this conclusion, *Boomer* noted § 203, which the FCC forbore from applying after passage of the 1996 Act, "merely served as a mechanism by which the FCC could assure compliance with the standards set forth in Sections 201 and 202," and that the goals of prohibiting and punishing unequal rates and preventing discrimination embodied in those sections

-12-

survived detariffing. *Id.* at 421 ("[E]ven though the FCC no longer mandates the filing of tariffs, the congressional objective of providing uniform rates, terms and conditions remains, as does the federal prohibition on terms and conditions which are unjust or unreasonable."). As a result, the Seventh Circuit concluded "[a]llowing state law challenges to the validity of the terms and conditions contained in long-distance contracts . . . results in the very discrimination Congress sought to prevent" and, therefore, concluded such state law challenges were preempted. *Id.* at 423.

Shortly after *Boomer* was decided, the Ninth Circuit reached the opposite result in *Ting*, 319 F.3d at 1135. *Ting* held California's unconscionability law did not "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting §§ 201(b) and 202(a) of the [FCA]." *Id.* at 1137 (quotation omitted). Unlike *Boomer*, *Ting* believed § 203 to be the "heart of the common-carrier section of the Communications Act." *Id.* at 1141 (quotation omitted); *id.* at 1142 ("[I]n authorizing the FCC to forbear from enforcing the tariff filing requirement, Congress not only removed its chosen means of enforcing §§ 201 and 202, it removed the heart of the 1934 Act." (quotations omitted)). Without § 203, *Ting* held the remaining provisions of the FCA lacked preemptive force because they "contain[ed] substantive standards that are enforceable only if they have an enforcement vehicle, such as the filing requirement." *Id.* at 1142. The *Ting* decision then turned to congressional intent

-13-

underlying the 1996 Act, and held Congress intended a "competition based regime" in which "state law protections are no longer excluded as they once were under the express terms of the filed rate doctrine." *Id.* at 1143; *id.* at 1146 ("[W]hereas Congress previously required tariffs to ensure strict uniformity with §§ 201 and 202's standards, Congress now relies on competition to ensure a more market-oriented (and less collusive) level of compliance with §§ 201 and 202."). *Ting* therefore concluded there was no conflict between the remaining sections of the FCA and California's unconscionability law. *Id.* at 1146.[3]

---

[3]After the Ninth Circuit decided *Ting*, the Seventh Circuit reaffirmed its position in *Dreamscape Design, Inc. v. Affinity Network, Inc.*, 414 F.3d 665 (7th Cir. 2005) ("For the reasons we discussed at length in *Boomer*, we do not see how Congress's clearly expressed intent regarding uniformity and reasonableness of rates, as demonstrated in Sections 201 and 202 of the FCA, can be squared with *Ting*'s apparent conclusion that state contract law can invalidate the terms or conditions of long-distance contracts after detariffing."). Several state courts have followed the Seventh Circuit's approach. *See World-Link, Inc. v. Mezun.com, Inc.*, 827 N.Y.S.2d 642, 653 (N.Y. Sup. Ct. 2006) ("[B]ecause entitling Mezun to receive different rates, terms, and conditions of service from World-Link's other customers creates an obvious obstacle to the accomplishment of equality and uniformity of rates and terms of service, Mezun's common law defenses of waiver and equitable estoppel are preempted by sections 201 and 202 of the Communications Act."); *Ramette v. AT&T Corp.*, 812 N.E.2d 504, 514 (Ill. App. Ct. 2004) ("We agree with *Boomer* . . . that the congressional objective of achieving uniformity in rates, terms, and conditions of service survived detariffing. Allowing state challenges would impede the congressional objective of achieving uniformity in telecommunication services."); *Field v. AT&T Corp.*, No. CV030827266S, 2004 WL 615686, at *2 (Conn. Sup. Ct. Mar. 12, 2004) ("*Boomer* . . . seem[s] to be more persuasive concerning the federal preemption arguments . . . ."). At least one state court has sided with *Ting*. *See McKee v. AT&T Corp.*, 191 P.3d 845, 855 (Wash. 2008) ("We agree with the Ninth Circuit that reliance on sections 201 and 202 for federal preemption is untenable.").

This court agrees with the Seventh Circuit's determination in *Boomer* that the uniformity principle embodied in §§ 201 and 202 of the FCA survived detariffing and preempts state law challenges to the reasonableness of the rates, terms, and conditions of service provided by telecommunications carriers. Section 201(b) of the FCA provides: "All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification or regulation that is unjust or unreasonable is declared to be unlawful." 47 U.S.C. § 201(b). Section 202(a) of the FCA provides:

> It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

47 U.S.C. § 202(a). These sections "demonstrate a congressional intent that individual long-distance customers throughout the United States receive uniform rates, terms and conditions of service." *Boomer*, 309 F.3d at 418; *see also Cent. Office Tel.*, 524 U.S. at 223 ("It is that antidiscriminatory policy which lies at the heart of the common-carrier section of the Communications Act.") (quotation omitted). Applying the laws of all fifty states to AT&T's interstate long-distance service contracts would impede this Congressional objective of achieving

-15-

uniformity in the rates, terms and conditions of such services. *See Boomer*, 309 F.3d at 418-19 (noting that allowing such challenges would result in "patchwork contracts" and "conflict[] with Section 202's prohibition on providing advantages or preferences to customers based on their 'locality'").

This conclusion is not altered by the fact that pre-detariffing cases focus predominantly on § 203's filed-rate doctrine rather than the uniformity principle embodied in §§ 201 and 202. *See, e.g.*, *Cent. Office Tel.*, 524 U.S. at 222-24 (focusing exclusively on the preemptive effect of § 203); *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 220, 229 (1994) (referring to the tariff-filing requirement as the "heart" and "centerpiece" of the 1934 Act); *ICOM Holding, Inc. v. MCI Worldcom, Inc.*, 238 F.3d 219, 221-23 (2d Cir. 2001) (holding the filed-rate doctrine barred state-law claims pertaining to the price, service, provisioning, and billing of telecommunications services). Not surprisingly, cases brought after detariffing focus solely on the uniformity principle of §§ 201 and 202. *See, e.g.*, *Orloff v. FCC*, 352 F.3d 415, 420 (D.C. Cir. 2003) (holding that post-detariffing, the legality of a telecommunications carrier's terms of service "depends not on the company's designation as a common carrier, but on § 202 (and § 201)").[4]

_____

[4]Pre-1934 cases decided under the Interstate Commerce Act (ICA) support the conclusion that the preemptive force of the language of §§ 201 and 202 was not tethered to § 203. The 1934 Act was modeled after the ICA, *see AT&T v. Cent. Office Tel., Inc.*, 524 U.S. 214, 222 (1998); *MCI Telecomms. Corp. v. FCC*, 917 F.2d 30, 38 (D.C. Cir. 1990), and §§ 201 and 202 carried forward the substantive requirements of §§ 1-3 of the ICA. *See* H.R. Rep. No. 73-1850, at 4

(continued...)

That the uniformity principle survived detariffing is also evidenced by the language of the 1996 Act which obligated the FCC to forebear from enforcing aspects of the 1934 Act. The 1996 Act did not allow the FCC to forebear from applying provisions of the 1934 Act as it saw fit. Rather, the 1996 Act limited the FCC's forbearance authority to provisions which were "not necessary to ensure that the charges, practices, classifications, or regulations . . . are just and reasonable and are not unjustly or unreasonably discriminatory," "not necessary for the protection of consumers," and "consistent with the public interest." 47 U.S.C. § 160(a). These requirements explicitly ensured the uniformity goals of §§ 201 and 202 would remain, even in the event the FCC determined the then-

_____

[4](...continued)
(1934) (noting the 1934 Act copied those sections of the ICA verbatim "to preserve the value of court and commission interpretation" of those provisions); *see also Ivy Broad. Co. v. AT&T Co.*, 391 F.2d 486, 490-91 (2d Cir. 1968) ("Since the Communications Act and the 1910 amendment to the Interstate Commerce Act were intended to achieve the same objectives with regard to communications carriers, cases decided prior to 1934 under the Interstate Commerce Act retain their importance for purposes of determining the scope of the Communications Act of 1934."). Decisions from this period support the notion that a federal uniformity requirement has preemptive effect even in the absence of a tariff filing requirement. *See, e.g.*, *W. Union Tel. Co. v. Esteve Bros. & Co.*, 256 U.S. 566, 573 (1921) (holding state-law challenges to limitation of liability clauses are barred due to the preemptive effect of "the requirement of equality and uniformity of rates laid down in § 3 of the [ICA]"); *Postal Tel.-Cable Co. v. Warren-Godwin Lumber Co.*, 251 U.S. 27, 31 (1919) (holding §§ 1-3 of the ICA barred a state-law challenge to a provision in a telegraph company's contract because it would "wholly destro[y]" the "purpose" of the ICA if "the validity of contracts made by telegraph companies as to their interstate commerce business continued to be subjected to the control of divergent and conflicting local laws").

-17-

existing means of achieving this uniformity, § 203's filed-rate doctrine, was no longer the preferred mechanism for accomplishing this goal. *See Second Report & Order*, 11 FCC Rcd. 20,730, ¶ 27 (concluding "our decision to forbear from requiring nondominant interexchange carriers to file tariffs for interstate, domestic, interexchange services will not affect such carriers obligations under Sections 201 and 202 to charge rates, and to impose practices, classifications and regulations, that are just and reasonable and not unjustly or unreasonably discriminatory"); *Order on Reconsideration*, 12 FCC Rcd. 15,014 , ¶ 75 (same).

The precise scope of the uniformity principle set out in §§ 201 and 202, however, is more difficult to ascertain than the scope of the filed-rate doctrine, which was "strict[ly]" applied and operated "harsh[ly] in some circumstances." *Cent. Office Tel.*, 524 U.S. at 222-23 (quotation omitted); *id.* at 222 (noting that under the filed-rate doctrine, "even if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff"). For example, in *Orloff*, the D.C. Circuit held certain differences in rates, such as those which result from a phone carrier reaching different terms of service with similarly situated customers on the basis of market "haggling," do not run afoul of §§ 201 or 202. 352 F.3d at 421. Similarly, in *Panatronic, USA v. AT&T Corp.*, the Ninth Circuit held a "temporary price difference" caused by a delay in imposing a UCC charge did not constitute unreasonable discrimination in violation of § 202(a). 287 F.3d

840, 844 (9th Cir. 2002) ("A difference in price is not unreasonable if there is a neutral, rational basis underlying [the disparity]." (quotation omitted)). FCC orders similarly reflect a trend towards greater tolerance of certain differences in the rates charged by telecommunications providers. *See, e.g.*, *In re Digital Cellular, Inc.*, 20 FCC Rcd. 8723, ¶ 15 (2005) (holding it is reasonable for a phone carrier to offer service on different terms to materially different companies); *In re Bruce Gilmore*, 20 FCC Rcd. 15,079, ¶ 26 (2005) (holding it is reasonable for a phone carrier to negotiate better deals with some customers than others, so long as there is no market failure that prevents customers from switching carriers if they are dissatisfied).

In light of the uncertainty regarding the scope of §§ 201 and 202 in a detariffed marketplace, AT&T filed a petition with the FCC requesting it "clarify that federal, and not state, law governs the determination as to whether a nondominant interexchange carrier's rates, terms, and conditions . . . are lawful." *Order on Reconsideration*, 12 FCC Rcd. 15,014, ¶ 76. In response, the FCC ordered that §§ 201 and 202 of the Communications Act "continue[d] to govern determinations as to whether rates, terms, and conditions for interstate, domestic, interexchange services are just and reasonable, and are not unjustly or unreasonably discriminatory." *Id.* at 15,014, ¶ 77. The FCC also concluded that "the Communications Act does not govern other issues, such as contract formation and breach of contract, that arise in a detariffed environment," and that

"consumers may have remedies under state consumer protection and contract laws as to issues regarding the legal relationship between the carrier and customer in a detariffed regime." *Id.*

An agency's conclusion that state law is preempted is not necessarily entitled to deference. *Wyeth v. Levine*, 129 S. Ct. 1187, 1201 (2009) ("While agencies have no special authority to pronounce on pre-emption absent delegation by Congress, they do have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (quotation omitted)); *see also Geier v. American Honda Motor Co.*, 529 U.S. 861, 883 (2000) (according "some weight" to an agency's interpretation of the preemptive effect of a statute); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 505-06 (1996) (Breyer, J., concurring) ("[I]n the absence of a clear congressional command as to pre-emption, courts may infer that the relevant administrative agency possesses a degree of leeway to determine which rules, regulations, or other administrative actions will have pre-emptive effect." ). The *Wyeth* decision made clear "[t]he weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness." 129 S. Ct. at 1201.

In applying this standard, *Wyeth* looked to whether the agency's preemption determination was consistent with the positions it took in the past and whether its

rulemaking process was procedurally sound. *Id.* at 1201-03. *Wyeth* concluded the FDA's preemption position did not merit deference for two reasons. *Id.* at 1201. First, it noted the FDA's notice of proposed rulemaking was completely at odds with its finalized rule. *Id.* at 1201 (highlighting "[t]he agency's views on state law are inherently suspect in light of this procedural failure"). Second, the Court discredited the FDA's position on preemption because it represented a reversal of "the FDA's own longstanding position without providing a reasoned explanation, including any discussion of how state law has interfered with the FDA's regulation of drug labeling during decades of coexistence." *Id.*

The FCC's actions in the present case are distinguishable from the FDA's in *Wyeth*. This court is not aware of any procedural errors committed by the FCC in promulgating the detariffing orders, and, although the FCC's ultimate preemption position represented a departure from the one it advanced in a prior detariffing order, the FCC's ultimate position is consistent with its longstanding policy of interpreting §§ 201 and 202 of the FCA (and similarly worded provisions of the ICA) as ensuring the uniformity of rates, terms, and conditions provided by interstate telecommunications carriers. Accordingly, this court concludes the FCC's position that the FCA continues to preempt state law challenges to "the rates, terms, and conditions for interstate, domestic, interexchange services" but not others, such as "contract formation and breach of contract" merits deference. *Order on Reconsideration*, 12 FCC Rcd. 15,014, ¶ 77.

-21-

The FCC's notice of proposed rulemaking requested commenters to consider the effect of §§ 201 and 202 in the detariffed marketplace. 11 FCC Rcd. 7141, ¶¶ 94-96. The FCC's initial response to this question was clear: "in the absence of tariffs, consumers will be able to pursue remedies under state consumer protection and contract laws in a manner currently precluded by the 'filed-rate' doctrine." *Second Report and Order*, 11 FCC Rcd. 20,730, ¶ 38; *see also id.* ¶ 5 ("[W]hen interstate, domestic, interexchange services are completely detariffed, consumers will be able to take advantage of remedies provided by state consumer protection laws and contract law against abusive practices."); *Id.* ¶ 42 ("In the absence of such tariffs, consumers will not only have our complaint process, but will also be able to pursue remedies under state consumer protection and contract laws."). As noted, however, the FCC clarified its position in a subsequent order, explaining that while the terms and conditions of long-distance service contracts are still governed by the FCA, other aspects of the carriers' conduct are subject to other federal and state law. *Order on Reconsideration*, 12 FCC Rcd. 15,014, ¶ 77. Thus, unlike the regulation in *Wyeth*, there were no procedural failures during the FCC's promulgation of the detariffing orders that render the FCC's preemption position "inherently suspect." 129 S. Ct. at 1201.

The FCC's ultimate preemption position nevertheless represented a departure from the position initially taken in its *Second Report and Order*. The FCC's clarification, unlike the FDA's abrupt reversal in *Wyeth*, however, is

reasonable in light of the uncertainty regarding the scope of the uniformity

principle embodied in §§ 201 and 202 in the detariffed marketplace. The FCC's

ultimate position is consistent with the FCA's overarching goal of prohibiting

state-by-state variations in the rates, terms, and conditions of interstate

telecommunications services. As noted, this uniformity goal is reflected in the

language of §§ 201 and 202 of the 1934 Act as well as in the limits the 1996 Act

placed on the FCC's authority to forebear from applying sections of the 1934 Act.

The continuing validity of this uniformity principle is underscored by judicial and

agency interpretations of §§ 201 and 202 rendered both before and after

detariffing. *See, e.g.*, *Global Crossing Telecomm., Inc. v. Metrophones

Telecomms., Inc.*, 550 U.S. 45, 55 (2007) (interpreting § 201(b)'s reasonableness

requirement post-detariffing); *Orloff*, 352 F.3d at 420 (interpreting §§ 201 and

202 post-detariffing); *Nader v. FCC*, 520 F.2d 182, 201 (D.C. Cir. 1975)

(interpreting § 202's non-discrimination requirement pre-detariffing); *Digital

Cellular*, 20 FCC Rcd. 8723, ¶¶ 14-15 (interpreting §§ 201 and 202 post-

detariffing); *In re RCA Am. Commc'ns, Inc.*, 84 F.C.C.2d 353, ¶ 8 (1980)

(interpreting the reasonableness requirement of § 201 pre-detariffing); *see also

Postal Tel.-Cable Co. v. Warren-Godwin Lumber Co.*, 251 U.S. 27, 31 (1919)

(holding the uniformity requirements of the ICA barred state-law challenges to a

provision in a telegraph company's contract). Accordingly, although detariffing

ended the strict uniformity imposed by § 203's filed-rate doctrine, it did not

-23-

lessen the preemptive force of the uniformity requirements that remained in §§ 201 and 202. The district court's deferral to the FCC's order, and its resulting determination that the FCA preempted the non-California residential plaintiffs' substantive unconscionability claims, but not their procedural unconscionability claims, is therefore correct. On appeal, the plaintiffs do not challenge the district court's conclusion that the CSAs' arbitration clauses were procedurally conscionable under New York state law. Accordingly, the district court did not err in enforcing those arbitration clauses against the non-California residential plaintiffs.

### 2. Business Customers' Breach of Contract Claims

This court reviews the district court's order granting AT&T summary judgment on the business customers' breach of contract claims de novo applying the same legal standard as the district court. *Union Standard Ins. Co. v. Hobbs Rental Corp.*, 566 F.3d 950, 952 (10th Cir. 2009). The business customer plaintiffs alleged AT&T breached its contracts by charging them for administrative expenses that were not associated with the collection of the UCC. In granting AT&T's motion, the district court correctly decided the plaintiffs failed to raise a genuine issue of material fact.

The relevant provision in AT&T's Business Service Guide allowed AT&T to collect the amounts it paid into the USF "plus associated administrative costs." The Business Service Guide also listed the UCC rate applicable to the business

customers' interstate and international charges.  The business customers argue

AT&T calculated the amount of administrative costs it billed on costs other than

those "associated" with the collection and payment of USF expenses.

Specifically, the plaintiffs point to AT&T's Undisputed Fact No. 44, which

described its method of calculating administrative expenses:

> The ABS administrative expense estimates (sometimes referred to as
> "overheads") were calculated by taking actual administrative
> expenses "for all business services," dividing it "by the underlying
> revenues" to obtain an administrative expense "percentage of total
> revenues," and multiplying that administrative-expense percentage by
> the total billed USF revenues.

These rates ranged from 9.97% to 10.97% of the UCC, which in turn amounted to

approximately 1.0% of a customer's total interstate and international phone

charges.  On April 1, 2003, after the close of the class period, AT&T's method of

billing for the administrative expenses associated with the UCC changed.  This

change came shortly after an FCC order required the carriers separately disclose

to their customers any administrative expenses associated with the UCC charge.

*In re Federal-State Joint Board on Universal Service, CC Docket Nos. 96-45, 98-*

*171, 92-237, 99-200, 95-116, 98-170, Report & Order & Second Further Notice*

*of Proposed Rulemaking*, 17 FCC Rcd. 24,952, ¶ 48 (2002).  This new, separately

listed Administrative Expense Fee was 0.74% of a customer's total interstate and

international phone charges during its first year in existence, and 0.88% during its

second.

The plaintiffs argue AT&T's method of calculating UCC administrative expenses was flawed because it made no attempt to quantify and assess the actual costs "associated" with administering the USF. Plaintiffs contend this fact alone precluded summary judgment because AT&T's expenses for "all business services" were not associated with the collection and payment of the USF. The undisputed fact cited by the plaintiffs does not establish a triable issue on whether AT&T recovered administrative expenses not associated with the USF. It stated only that the total administrative expenses recovered through the UCC were calculated by determining the administrative expenses associated with each dollar of revenue from "all business services" and then "multiplying" that percentage figure by the "billed USF revenues." There is no evidence this method could have resulted in an over-recovery of administrative expenses associated with the USF. In particular, there is no evidence the administrative tasks and expenses associated with billing and collecting the UCC were less cost sensitive than those associated with billing and collecting other revenues for business services.

The business customer plaintiffs next contend the undisputed fact that the percentage rate AT&T charged was lower after the FCC's April 1, 2003 rule change created a triable issue as to whether AT&T overcharged its business customers during the class period. This argument also fails. Plaintiffs fail to point to any evidence indicating AT&T's method of calculating the UCC administrative charge changed when the FCC's listing requirement was imposed.

-26-

Nor do they point to evidence indicating the fluctuations in the administrative charges associated with the UCC trended differently from those associated with other aspects of AT&T's operations. Evidence of a reduction in the administrative charge from 1.0% to 0.74%, and subsequent increase to 0.88%, standing alone, does not create a genuine issue of material fact as to whether AT&T charged its business customers for administrative costs not associated with the USF prior to the FCC's order. Accordingly, the district court's dismissal of the business customers' breach of contract claim was proper.

### 3. California Residential Customers Breach of Contract Claims

The district court denied AT&T's motion for summary judgment with respect to the breach of contract claims brought by the California residential customers. AT&T renewed its summary judgment motion with respect to the residential customers claims, and the district court similarly denied the renewed motion. After the jury found in favor of the California residential customers at trial, AT&T filed a motion for judgment as a matter of law and a motion for a new trial, both of which the district court denied. The district court's interpretation of the CSA, including its determination that the CSA was unambiguous, is reviewed de novo. *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154-55 (10th Cir. 2008). The district court's jury instructions are reviewed de novo to determine whether, as a whole, they "correctly stated the governing law and provided the jury with an ample understanding of the issues

and applicable standards." *O'Tool v. Genmar Holdings, Inc.*, 387 F.3d 1188, 1198 (10th Cir. 2004). The parties agree the contract claims are governed by New York law.

AT&T asserts that, as a matter of law, it could not have breached its obligations under the CSA because it always charged the UCC percentage specified in the applicable Consumer Service Guide. The proper interpretation and effect of the description of the UCC provided in the Consumer Service Guide is central to the resolution of AT&T's claim on appeal. That description reads: "The AT&T Universal Connectivity Charge is a monthly charge to Customers to recover amounts AT&T must pay into a federal program called the Universal Service Fund (USF)." The district court determined this description unambiguously allowed AT&T to recover amounts AT&T must pay into the USF, and no more.

First, AT&T asserts that the "Description" sections of the Consumer Service Guides were not incorporated into the CSAs. AT&T is incorrect. The relevant language of the CSAs state:

> "AT&T Service Guides" contain the specific prices and charges, service descriptions and other terms and conditions not set forth here that apply to each of your Services. . . . THIS AGREEMENT INCORPORATES BY REFERENCE THE PRICES, CHARGES, TERMS AND CONDITIONS INCLUDED IN THE AT&T SERVICE GUIDES.

-28-

The CSAs then repeatedly make reference to "the incorporated AT&T Service Guides." The passage from the CSAs quoted above unambiguously incorporates the description of the UCC. The absence of the word "descriptions" from the capitalized sentence does not prevent the incorporation of the "Description" sections of the Service Guides. To the contrary, the use of the word "other" in the first sentence indicates the descriptions are in fact considered part of the terms and conditions that govern the contractual relationship.[5] Furthermore, the description of the UCC provided by the Service Guides contains a promise to set the UCC rate by reference to AT&T's own USF payments. This term is unambiguously incorporated into the CSAs by the CSAs' incorporation provision.

Second, AT&T argues that the promise is unenforceable due to its location in a "description" section of the contract. For support, AT&T cites *Phillips v. AIG, Inc.*, in which a district court refused to interpret a general description of the interest rate in an annuity contract as containing a separate, enforceable promise. 498 F. Supp. 2d 690, 695 (S.D.N.Y. 2007). *Phillips*'s rejection of the plaintiff's argument was based upon the content, not location of the provision. *Id.* (stating the language at issue "standing alone, merely explains that interest rates quoted

---

[5]The passage's reference to "service descriptions," as opposed to "fee descriptions" or "charge descriptions" does not introduce any ambiguity into the incorporation provision. Rather, the incorporation of the "prices, charges, terms and conditions included in the AT&T service guides" unambiguously incorporates the language of the UCC description which permitted AT&T to collect only those amounts "AT&T must pay into [the USF]."

elsewhere in the Annuity Contracts are 'effective annual interest rates' and does not make any independent promise about what those interest rates are"). The remaining cases cited by AT&T all address the effect of language found in introductory recital clauses such as "Purpose" and "Whereas" clauses. *United States v. Hamdi*, 432 F.3d 115, 123 (2d Cir. 2005) (construing prefatory language of a plea agreement); *Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001) (holding "because the plan specifies with such clarity which tax provisions are to be taken into account, we find it unreasonable to treat the imprecision of the general purpose clause as overriding the specificity of the detailed computation clauses"); *Genovese Drug Stores, Inc. v. Conn. Packing Co.*, 732 F.2d 286, 291 (2d Cir. 1984) (holding "an expression of intent in a 'whereas' clause of an agreement between two parties may be useful as an aid in construing the rights and obligations created by the agreement, but it cannot create any right beyond those arising from the operative terms of the document"); *Jones Apparel Group, Inc. v. Polo Ralph Lauren Corp.*, 791 N.Y.S.2d 409, 410 (N.Y. App. Div. 2005) (holding "[s]ince the contract is unambiguous on its face, there is no need to refer to its recitals"); *Trump Vill. Section 3, Inc. v. N. Y. State Hous. Fin. Agency*, 739 N.Y.S.2d 37, 38 (N.Y. App. Div. 2002) (same).

According to AT&T, the difference between such recital clauses and the "Description" sections of the Consumer Service Guides is irrelevant under New York law. *See Sengillo v. Valeo Electrical Systems, Inc.*, 536 F. Supp. 2d 310,

312 (W.D.N.Y. 2008). The *Sengillo* case, however, merely stands for the proposition that "introductory recitals which serve no operative purpose" generally do not contain "enforceable contractual term[s]" regardless of how they are named. *Id.* at 312. In contrast, the "Description" sections of the AT&T Service Guides were incorporated into the CSAs for the purpose, according to the CSA language itself, of providing the "the specific prices and charges, service descriptions and other terms and conditions not set forth here that apply to each of your Services." Rather than introduce terms more fully set forth in other sections of an operative agreement, the Service Guides provided the operative terms and conditions that were binding upon the parties and not set forth elsewhere in their agreements. Furthermore, unlike the introductory language at issue in the cases cited by AT&T, the description of the UCC in the Service Guides makes an independent promise as to the nature of that charge. It unequivocally states that the UCC "is a monthly charge to Customers to recover amounts AT&T must pay" into the USF.[6] None of the authorities cited by AT&T support invalidating this promise simply because it is located in a "description" section of an expressly incorporated service guide.

_____

[6]AT&T also contracted for the right, stated in the final sentence of the Service Guides "Description" of the UCC, to revise its UCC rate if "the amount of its required contribution to the USF changes." This language further underscores the notion that AT&T was required to tether the UCC rate to the amount it was required to pay into the USF.

Third, AT&T argues the description of the UCC cannot constitute a separate and independent promise under New York law because it merely explains what the UCC charge is without imposing any separate obligation on AT&T. Under New York law, "[a] promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.*, 460 N.E.2d 1077, 1081 (N.Y. 1984) (quotation omitted). This means that a contract contains "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Sutton v. East River Savs. Bank*, 435 N.E.2d 1075, 1078 (N.Y. 1982) (quotations omitted). As a result, words such as "agree," "will," or "shall," are not required to form a promise under New York law. *See id.* (taking into account "not merely literal language, but whatever may be reasonably implied therefrom").[7]

---

[7]The cases cited by the dissent, *Merritt Hill Vineyards, Inc. v. Windy Heights Vineyards, Inc.*, 460 N.E.2d 1077 (N.Y. 1984) and *United States v. Hamdi*, 432 F.3d 115 (2d Cir. 2005) do not support the proposition that particular promissory phrases are required to form a binding promise. *Merritt Hill* addressed the question of whether a provision in a real estate contract was a condition or a promise. 460 N.E.2d at 1081-82. The provision at issue required the seller to produce a title insurance policy and mortgage confirmation at closing. The court concluded it was a condition, in part because it was found under the heading "Conditions Precedent to Purchaser's Obligation to Close," and in part because "[n]o words of promise were used." *Id.*

*Hamdi* involved the question of whether the phrase, "The defendant's sentence is governed by the United States Sentencing Guidelines," constituted a waiver of the defendant's right to seek a remand. 432 F.3d at 117. Because *Hamdi* involved the construction of a waiver found in a plea agreement, the court

(continued...)

A reasonable promissee would certainly read the phrase, "The AT&T Universal Connectivity Charge is a monthly charge to Customers to recover amounts AT&T must pay into the [USF]" as a promise that AT&T would charge a UCC in the amount it must pay into the USF and no more. Accordingly, the phrase constitutes a valid promise under New York law.

Fourth, AT&T argues the district court impermissibly added language and terms to the agreements between the parties. AT&T's argument centers around the district court's conclusion "as a matter of law that the contract unambiguously provides that AT&T could 'recover amounts AT&T must pay' into the USF program, and no more," as well as its decision to imply AT&T had an obligation to balance the UCC amounts it recovered with the amounts it was required to pay over a reasonable period of time.

Under New York law, it is well settled that courts "may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Bailey v.*

---

[7](...continued)
interpreted the language "narrowly" against the government due to the "special due process concerns for fairness and the adequacy of procedural safeguards." *Id.* at 122-23 (quotations omitted). Nevertheless, the court observed that the phrase in question, read in isolation, "could be read as a covenant to which Hamdi agreed," but it declined to do so based on the context in which the phrase appeared. *Id.* at 125 (noting also that to the extent the phrase was ambiguous, "well-settled principles of construction of plea agreements [required resolution of] this ambiguity in [the defendant's] favor"). Accordingly, neither *Merritt Hill* nor *Hamdi* support the proposition that only provisions featuring the words "agree," "will," or "shall" constitute promises.

*Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007) (quotation omitted).  However, it is equally well-settled that "[b]efore rejecting an agreement as indefinite, a court must be satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that make its meaning clear." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 548 N.E.2d 203, 206 (N.Y. 1989). "The conclusion that a party's promise should be ignored as meaningless is at best a last resort." *Id.* (quotation omitted).

The district court did not add a term to the CSAs by ruling AT&T could "recover amounts AT&T must pay" into the USF program, "*and no more*." Rather, adding "and no more" merely emphasized the operative promise which governs the contractual relationship between AT&T and its customers.  As previously discussed, that promise was that AT&T would collect via the UCC charge those amounts "it must pay" into the USF.  Thus, the district court's addition of the phrase "and no more" merely emphasized the reality of what the parties had already agreed to.  Interpreting the contract to allow AT&T to recover amounts in addition to "what it must pay into [the USF]," by contrast, involves a distortion of the contract's meaning not permissible under New York law. *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 920 N.E.2d 359, 363 (N.Y. 2009).

Further, the district court did not err in implying a reasonable time period into the CSAs.  Under New York law, "[w]hen a contract does not specify time of

performance, the law implies a reasonable time." *Savasta v. 470 Newport Assocs.*, 623 N.E.2d 1171, 1172 (N.Y. 1993). "What constitutes a reasonable time for performance depends upon the facts and circumstances of the particular case." *Id.* at 1172; *see also Haines v. City of New York*, 364 N.E.2d 820, 822-23 (N.Y. 1977) ("In the absence of an express term fixing the duration of a contract, the courts may inquire into the intent of the parties and supply the missing term if a duration may be fairly and reasonably fixed by the surrounding circumstances and the parties' intent."). The district court properly determined the contract to be sufficiently definite to require AT&T to calibrate its UCC collections to match its required USF payments over a reasonable period of time. Accordingly, AT&T could breach its promise by repeatedly overcollecting UCC charges without timely issuing refunds or revising its UCC rate to compensate for its overbilling.

Fifth, AT&T argues the district court's reading of the CSA allows the general description of the UCC to improperly override the specific UCC rates listed in the incorporated Service Guides. This is not the case. Under New York law, "a contract should be construed so as to give full meaning and effect to all of its provisions." *Duane Reade, Inc. v. Cardtronics, LP*, 863 N.Y.S.2d 14, 19 (N.Y. App. Div. 2008). The provisions at issue impose separate obligations that can be read to give full meaning and effect to both. In the first promise, AT&T agreed to limit its UCC collections to amounts it was required to pay into the USF, and provided a mechanism for changing this rate. In the second promise, AT&T

agreed to assess the UCC at a specific percentage.  It is perfectly reasonable for the CSAs to include an obligation regarding how the UCC rate is set separate from an obligation to charge the stated rate.  The second promise does not pertain to the permissible scope of UCC collections; rather, it only defines the mechanism for collecting funds for a particular period.  Accordingly, the district court's reading did not allow general language of the CSAs to impermissibly override specific language.  Rather, its reading properly gave full meaning and effect to both portions of the contract.[8]

Finally, AT&T argues the California residential plaintiffs' construction of the contracts renders them absurd.  AT&T correctly notes that under New York law, "[a] contract should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties."  *Lipper Holdings LLC v. Trident Holdings, LLC*, 766 N.Y.S.2d 561, 562 (N.Y. App. Div. 2003) (citations omitted); *accord Fresh Del Monte Produce N.V. v. Eastbrook Caribe A.V.V.*, 836 N.Y.S.2d 160, 164 (N.Y. App. Div. 2007).  These cases, however, do not support excising an agreed upon promise merely

---

[8]Allowing the promise to charge a particular percentage to override the promise to only charge the amounts AT&T "must pay" effectively writes the latter promise out of the contract.  Certainly, the chosen rate would nevertheless also need to comply with the "just and reasonable" requirement found in 47 U.S.C. § 201(b).  In this case, § 201(b) does not preempt the California residential plaintiffs' additional state-law claims due to the collateral estoppel effect of *Ting v. AT&T*, 182 F. Supp. 2d 902 (N.D. Cal. 2002), *aff'd*, 319 F.3d 1126 (9th Cir. 2003).

because it imposes an inconvenient burden on one of the parties; rather, they address true absurdities. *See, e.g.*, *Fleischman v. Furgueson*, 119 N.E. 400, 402 (N.Y. 1918) (refusing to construe an ambiguous separation agreement to give the surviving husband greater access to the wife's property than he would have had "if they had lived happily together"); *Fresh Del Monte Produce*, 836 N.Y.S. at 164 (holding that an indemnification provision making a party liable for a company's "decline in value" did not encompass unrealized losses, such as a transitory decline in stock price); *Lipper*, 776 N.Y.S.2d at 562 (limiting general partner's discretion to revalue limited partners' capital accounts to prevent, *inter alia*, general partner from being permitted to retain incentive compensation based on phantom profits); *Tougher Heating & Plumbing Co., Inc. v. State*, 423 N.Y.S.2d 289, 289 (N.Y. App. Div. 1979) (declining the invitation to interpret an ambiguous labor cost saving provision in a construction contract to allow the contractor to recover $100,000 if they performed the contract at a savings of $100,000, but only $500 if they performed at a savings of $101,000).

In the present case, AT&T alleges that it was difficult for it to predict the amounts it must pay to the USF due to the methodology used to calculate its contribution level. Certainly, this made it virtually impossible for AT&T to charge exactly the correct amount each billing cycle. AT&T could, however, implement a mechanism to allow it to calibrate its charges over several billing

cycles[9] to prevent repeated overbilling.[10]  The fact that the lag between the calculation and the billing of the USF forced AT&T to charge its customers a higher percentage rate than the USF percentage rate does not render absurd AT&T's promise to charge a UCC in the amount it must pay.  Finally, that AT&T was not required to recover the exact amount of its USF contributions is a non sequitur.  As noted above, in addition to fulfilling its federal obligations under 47 U.S.C. § 201(b), AT&T promised its customers to charge a UCC only in the amount it must pay into the USF.  This left AT&T with the option of either undercollecting the UCC or overcollecting the UCC and instituting a mechanism to calibrate its collections to match its required USF payments over a reasonable period of time.  The difficulty AT&T experienced in fulfilling its contractual obligation does not render the underlying promise unreasonable or absurd.  For all of the foregoing reasons, this court affirms the district court's denial of AT&T's motion for judgment as a matter of law.[11]

---

[9]The dissent refers to such mechanisms as "true-up" mechanisms.

[10]As noted by the dissent, AT&T knew how to implement provisions to provide refunds for overcharged services.  AT&T's unilateral failure to implement a similar mechanism to prevent overcollection of UCC does not render the proposition of implementing one absurd or commercially unreasonable.

[11]This court need not address AT&T's argument that the district court's reading of the contract improperly converted the CSA from an individual contract with individual subscribers into a classwide undertaking because AT&T forfeited this argument by failing to raise it below. *Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc.*, 413 F.3d 1163, 1167 (10th Cir. 2005).

-38-

AT&T's alternative argument, that it is entitled to a new trial on plaintiffs' breach of contract claim, is similarly premised on the district court's conclusion that the CSA unambiguously required AT&T to set its UCC so as to "'recover amounts AT&T must pay' into the USF program, and no more." The district court gave the following jury instruction:

> AT&T's contract with . . . plaintiffs permitted AT&T to impose a monthly USF charge on its customers to recover amounts AT&T was required to pay into the federal USF program. Thus, if you find that AT&T actually imposed charges greater than that necessary to recover amounts AT&T was required to pay into the federal USF program, you will find that AT&T breached its contract with the subclass of plaintiffs.

AT&T argues that even if this court rejects its argument that, as a matter of law, the CSAs did not create an enforceable promise to match the UCC charge with AT&T's USF expenditures, the district court nevertheless should have regarded the CSAs as ambiguous and left the issue for the jury.

Under New York law, a contract's meaning can be determined as a matter of law only when the relevant contract language is "wholly unambiguous" and conveys a "definite meaning." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008). Ambiguity, in this context, hinges on whether "the agreement on its face is reasonably susceptible of more than one interpretation." *Chimart Assocs. v. Paul*, 489 N.E.2d 231, 233 (N.Y. 1986); *see also Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 191 (2d Cir. 2006) ("Ambiguous language is that which is capable of more than one meaning when viewed objectively by a reasonably

intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." (quotation omitted)).

The district court's jury instruction on the residential plaintiffs' breach of contract claim "correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards." *O'Tool*, 387 F.3d at 1198. The CSAs, and the incorporated Service Guides, unambiguously required AT&T to set the UCC charge at the amount AT&T "must pay" into the federal USF program. This language is not reasonably susceptible to more than one interpretation. Accordingly, AT&T is not entitled to a new trial on the residential customers' breach of contract claim.

## 4. Remittitur

AT&T seeks to amend the judgment, pursuant to Fed. R. Civ. P. 59(e), to effect a further remittitur or reduction of the damages awarded to the residential customer plaintiffs by the jury on the claim for breach of contract. A district court's denial of a motion for remittitur is reviewed for an abuse of discretion. *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 434-35 (1996). When a state's substantive law governs a claim for relief, "state law provides the appropriate rules of decision for the district court to determine whether the verdict was excessive." *Century 21 Real Estate Corp. v. Meraj. Int'l Inv. Corp.*, 315 F.3d 1271, 1281 (10th Cir. 2003). Under New York law, a court will only

-40-

disturb a jury's damages award if "the jury could not have reached its verdict on any fair interpretation of the evidence," *Medco Plumbing, Inc. v. Sparrow Constr. Corp.*, 802 N.Y.S.2d 730, 732 (N.Y. App. Div. 2005), or if the award is not "within reasonable bounds and supported by the evidence," *Carpenter v. Weichert*, 379 N.Y.S.2d 191, 194 (N.Y. App. Div. 1976).

The jury was given the following instruction on the measure of damages for the breach of contract claim:

> The measure of damages for a breach of contract is the amount that will compensate plaintiffs for the loss caused by the breach. In this case, if you find for the subclass of plaintiffs on their claim for breach of contract, the proper measure of damages is the amount by which the USF charges collected by AT&T from its California residential customers exceeded the amount AT&T was required to pay into the Universal Service Fund for those customers.

AT&T argues the jury failed to follow this instruction in calculating damages because it did not include a $5,190,000 payment it made into the USF in 2005 for liabilities incurred during the class period.

This payment became necessary because AT&T refused to pay USF contributions on revenue earned from prepaid calling cards for several years and accordingly did not collect USF contributions from its prepaid calling card customers. In 2005, the FCC ordered AT&T to contribute to the USF on the basis of prepaid calling card revenue, including revenues earned from preceding periods. *In re AT&T Corp. Petition for Declaratory Ruling Regarding Enhanced Prepaid Calling Card Services*, 20 FCC Rcd. 4826, ¶ 31 (2005). AT&T argues

these USF payments based on prepaid calling cards sold to California customers during the class period, totaling $5,190,000, should have been included in the figure for AT&T's USF payments for purpose of the damages calculation under the court's instruction.

The district court rejected this argument, noting the evidence at trial supported the jury's damage calculation. First, the plaintiffs' expert, Dr. Simon Wilkie, testified he did not include the additional payment made in 2005 in his calculations because the expense was incurred long after the plaintiffs had been assessed the UCC charges at issue in this class action. AT&T's expert, Dr. Langenfeld, had no problem with Dr. Wilkie's refusal to take the calling card adjustment into account for the purpose of calculating anti-trust damages. Finally, Ellen Reid, AT&T's director of strategic pricing, also testified the calling card expenses were omitted because "[i]t wasn't considered in the period when we were calculating the rates because we assumed at that point that they were enhanced services and they were not to be assessed USF revenue." Reid then testified that the AT&T exhibit which omitted prepaid calling card expenses was her "best judgment of the fairest and most accurate way to look at AT&T's USF collections versus expenses for its residential customers in the period 1998 to March 31, 2003."

The propriety of the jury's determination is also bolstered by the district court's interpretation of the CSAs as requiring AT&T's UCC collections from

residential long-distance customers to match up with its USF payments for that group of customers.[12]  The prepaid calling cards at issue "allow[ed] purchasers to make long-distance telephone calls without subscribing to a long-distance service or using a credit card" by providing a consumer the option of purchasing a "fixed number of minutes at a fixed price." *AT&T Co. v. FCC*, 454 F.3d 329, 330 (D.C. Cir. 2006).  AT&T distributed these prepaid cards through "large retail outlets such as Wal-Mart and other third party distributors." *Id.* at 330-31.  On appeal, AT&T points to no evidence which suggests its failure to impose a UCC charge on its prepaid calling card customers could fairly be compensated by overcharging its residential customers.  Accordingly, the jury's decision to exclude prepaid calling card expenses from its damage analysis is amply supported and constitutes a "fair interpretation of the evidence." *Medco Plumbing*, 802 N.Y.S.2d at 732.  Thus, the district court did not abuse its discretion in denying AT&T's motion for remittitur related to the prepaid calling card expenses.

---

[12]The district court reasoned this term could properly be supplied to the contract for two reasons.  First, the evidence indicated "AT&T had separate UCC rates for its business and residential long-distance customers and that AT&T attempted to set each rate by reference to its USF payments for that particular group."  Second, the district court found further support in the FCC's order that "mandated that carriers not shift more than an equitable share of USF contributions to any customer group or group of customers."  AT&T did not challenge this aspect of the district court's order on appeal.

**IV. Conclusion**

For the foregoing reasons, this court **AFFIRMS** the decisions of the district court.

09-3059 & 09-3077, *Universal Service Fund Telephone Billing Practices Litigation v. AT&T Corp.*

**HOLMES**, Circuit Judge, concurring in part and dissenting in part.

I write separately to take issue with the majority's analysis of the breach-of-contract claim of the California residential consumers. *See* Maj. Op. at 27–38. Specifically, I believe that a straightforward interpretation of the AT&T Consumer Service Agreement ("CSA") and AT&T Service Guide ("CSG") ineluctably dictates the conclusion that the California residential consumers agreed to pay the specific Universal Connectivity Charge ("UCC") listed in the Rates and Charges section of the CSG. Although the majority concludes that AT&T hamstrung the applicability of this specific UCC with a generalized statement of purpose in a preliminary section of the CSG, I find that the CSA and CSG are not properly susceptible to that interpretation.

Based on my interpretation of the CSA and CSG, I would remand this matter to the district court and direct it to enter judgment in favor of AT&T as a matter of law on the California residential consumers' breach-of-contract claim. I thus would not reach the district court's disposition of the motion for a new trial, or the motion for remittitur. I concur with the majority's conclusions regarding preemption and the breach-of-contract claim of the business consumers.

## I.  Judgment as a Matter of Law

We should reverse the denial of AT&T's motion for judgment as a matter of law on the breach-of-contract claim of the California residential consumers because (1) a plain-meaning interpretation of the CSA and CSG shows that the California residential consumers agreed to pay the specific UCC listed in the Rates and Charges section of the CSG; (2) the Description section contains no separate and independent promise regarding the amount of the UCC; and (3) even if the Description section were to contain such a promise, the majority's decision still would miss the mark because it conflicts with basic principles of contractual interpretation.

### A.  Standard of Review

"We review de novo the denial of a motion for judgment as a matter of law." *Hysten v. Burlington N. Santa Fe Ry. Co.*, 530 F.3d 1260, 1269 (10th Cir. 2008).  In conducting this review, we will reverse the district court "only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 761 (10th Cir. 2009) (internal quotation marks omitted).  "A party is entitled to judgment as a matter of law only if all of the evidence, viewed in the light most favorable to the non-moving party, reveals no legally sufficient evidentiary basis to find for the non-moving party." *Burrell v. Armijo*, 603 F.3d 825, 832 (10th Cir. 2010).  Contract interpretation is a question of law, which we

also review de novo. *See Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008). New York law governs the interpretation of the CSA and CSG. Aplt. App. at 1653 ("This Agreement will be governed by the law of the State of New York, without regard to its choice of law rules . . . .").

### B.    Plain Meaning

Under New York law, we must interpret a contract in accordance with the intent of the parties. *See Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002). "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *IDT Corp. v. Tyco Grp., S.A.R.L.*, 918 N.E.2d 913, 916 (N.Y. 2009) (internal quotation marks omitted). "An agreement is unambiguous when its words have a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Vintage, LLC v. Laws Constr. Corp.*, 920 N.E.2d 342, 343 (N.Y. 2009) (internal quotation marks omitted) (brackets omitted).

In this action, the plain meaning of the CSA provides that the California residential consumers agreed to pay the specific UCC charge listed in the Rates and Charges section of the CSG. This plain meaning is evident from (1) the preamble to the CSA; (2) the general section on charges and payment; and (3) the section on taxes and other charges.

-3-

### 1. Preamble

In the preamble to the CSA, the California residential consumers "agree[d] to the prices, charges, terms and conditions in this agreement."  Aplt. App. at 1649 (capitalization omitted).  Because the CSA "incorporates by reference the prices[] [and] charges . . . in the [CSGs],"[1] *id.* (capitalization omitted), it includes the specific rates and charges listed in the CSG governing the UCC.  This CSG, in turn, provides that the UCC is equal to a specific percentage of a consumer's total interstate and international charges.[2]  *See, e.g.*, *id.* at 1666 ("The Universal Connectivity Charge is equal to 9.9% of your total billed state-to-state and international charges (excluding taxes).").

### 2. General Charges and Payment

Under section 1(a) of the CSA, the California residential consumers "agree[d] to pay [AT&T] for the Services at the prices and charges listed in the AT&T Service Guides."  *Id.* at 1649.  Even though the UCC does not appear to meet the definition of a "Service" under the CSA,[3] it does qualify as a "price and

---

[1]    Neither party disputes that the CSA incorporates by reference the UCC rates and charges listed in the CSG.  The parties do disagree on whether the CSA incorporates by reference the Description section of the CSG; this issue is addressed *infra* Part I.C.1.

[2]    This specific percentage fluctuated over the course of the relevant time period.  *See, e.g.*, Aplt. App. at 856 (9.9% on August 1, 2001); *id.* at 892 (11.5% on January 1, 2002); *id.* at 895 (11% on July 1, 2002).

[3]    The CSA defines the term "Service" to mean "state-to-state and international consumer telecommunications services" and identifies some of these

(continued...)

-4-

charge" for a "Service" that the California residential consumers received. Therefore, section 1(a) still required the California residential consumers to pay the specified UCC. Section 1(a) specifically notes that "[t]he prices and charges for the Services may also include, for example, monthly fees, monthly minimums, or connection charges." *Id.* Although section 1(a) does not list the UCC as an example of these "prices and charges," the common denominator of the listed examples is that they all consist of fees and charges associated with the provision of interstate and international telecommunications services. The UCC fits within this set of examples because it is a monthly charge that is calculated using the total billed amount of a consumer's interstate and international traffic. Thus, the California residential consumers were required to pay the UCC in the amount specified in the CSG (which the CSA incorporated).

### 3. Taxes and Other Charges

Under section 1(e) of the CSA, California residential consumers "must pay all taxes, fees, surcharges and other charges that [AT&T] bill[s] [them] for the Services." *Id.* at 1650. As discussed *supra*, the UCC is a fee or charge that AT&T imposes on consumers in connection with their use of interstate and international telecommunications services. Neither party disputes that "AT&T at

_____

[3](...continued)
service types as "direct-dialed from home, operator-assisted, [and] calling card calls." Aplt. App. at 1649. By contrast, the UCC is a price (i.e., fee) or charge associated with interstate and international telecommunications services and, therefore, is unlike the other "Services" under the CSA.

all times charged its residential customers precisely the percentage listed in the [CSG]." *Id.* at 822.

Although section 1(e) also provides that "[t]axes and surcharges will be in the amounts that federal, state and local authorities require us to bill you," *id.* at 1650, this provision does not support the majority's contention that AT&T may not charge consumers more than the amount it is required to contribute to the Universal Service Fund ("USF"). First, this sentence does not apply to the UCC because, as the district court recognized, the UCC is not a tax or a surcharge.[4] *See id.* at 995 (holding, as a matter of law, that the CSA is "unambiguous that the UCC is not a 'surcharge' that is subject to the limitation set forth in . . . § 1(e)"); *see also Federal-State Joint Bd. on Universal Serv.*, CC Docket No. 96-45, Report and Order, 12 FCC Rcd. 8776, 9211-12 ¶ 855 (1997) [hereinafter *Report and Order*] (stating that the FCC "believe[s] that it would be misleading for a carrier to characterize its [universal service] contribution as a surcharge" because "carriers retain the flexibility to structure their recovery of the costs of universal

---

[4]     AT&T comes perilously close to conceding that the UCC is a tax. Throughout its briefs, AT&T refers to the universal service payment as a "tax" that it passes through to its consumers. Although AT&T repeatedly uses the word "tax," it initially places that word in quotation marks. Aplt. Opening Br. at 5 (stating that the UCC is a charge that it "imposed on its residential customers so that they . . . would pay an equitable share of a 'tax' that the Federal Communications Commission ('FCC') had required all long distance telephone companies to pay in order to support 'universal [telephone] service'" (brackets in original)). This appears to indicate that AT&T employed this misnomer in an attempt to describe the complexities of USF contribution in common parlance.

service in many ways") ; *cf. Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 427 (5th Cir. 1999) (finding, in dicta, that universal service contributions are not a tax) (citing *Rural Tel. Coal. v. FCC*, 838 F.2d 1307, 1314 (D.C. Cir. 1988)).

Second, even if the UCC were a tax or a surcharge, it would not be subject to this provision because the federal authorities do not *require* AT&T to bill consumers for the UCC. *See Report and Order*, 12 FCC Rcd. at 9199 ¶ 829 ("[C]arriers will be permitted, but not required, to pass through their contributions to their interstate access and interexchange customers."); *see also Boomer v. AT&T Corp.*, 309 F.3d 404, 411 n.1 (7th Cir. 2002) ("[C]arriers *may* charge consumers to recover the cost of [universal service] contributions." (emphasis added)).

Thus, under the plain language of the CSA and CSG, AT&T has not breached its contract because it charged the California residential consumers the specific UCC listed in the Rates and Charges section of the CSG.[5] *See* Aplt. App.

---

[5] The California residential consumers have not alleged that AT&T charged them anything other than the UCC listed in the CSG. Plaintiffs instead complain that this interpretation of the CSA "would . . . hold that AT&T's customers agreed to a contract under which AT&T could charge any amount it chose for any purpose while still describing the assessment as a UCC charge." Aplee. Opening Br. at 50–51; *accord id.* at 58. This argument reflects a fundamental misunderstanding of the laws and regulations governing the USF mechanism. At all times relevant to this action, nothing in the statute or regulations prohibited AT&T from marking up the USF line item above the relevant contribution amount. *See Federal-State Joint Bd. on Universal Serv.*, Report and Order and Second Further Notice of Proposed Rulemaking, 17 FCC Rcd. 24952, 24978 ¶¶ 49, 51 (2002) [hereinafter *Report and Order II*] (noting that

(continued...)

at 772 ("It is undisputed that AT&T charged its residential customers precisely the percentage listed in the [CSG]."); *id.* at 822 (same).

## C. Description Section

The majority's interpretive analysis is misguided: it effectively circumvents the plain meaning of the CSA and CSG. In particular, when interpreting the CSG, the majority places an unnatural emphasis on a general statement of purpose in the introductory Description section instead of simply applying the specific UCC listed in the Rates and Charges section.

The Description section provides as follows:

> *The AT&T Universal Connectivity Charge is a monthly charge to Customers to recover amounts AT&T must pay into a federal program called the Universal Service Fund (USF).* The USF helps provide affordable telecommunications services for low-income customers and customers in rural areas. It also provides discounts on Internet access for eligible schools, libraries and

---

(...continued)
"carriers may not mark up federal universal service line-item charges above the relevant contribution factor" once the new universal service contribution methodology takes effect *on April 1, 2003*, which was after the times relevant here). Of course, AT&T did not have free reign to charge *any* amount because the UCC must be "just and reasonable." 47 U.S.C. § 201(b) (providing that "[a]ll charges . . . for and in connection with such communication service[] shall be just and reasonable"). AT&T also "may not shift more than an equitable share of [its] contributions to any customer or group of customers." *Report and Order*, 12 FCC Rcd. at 9199 ¶ 829.

rural health care providers. AT&T will revise the Universal Connectivity Charge if the method and/or amount of its required contribution to the USF changes.

*Id.* at 1665 (emphasis added). The majority follows the district court in interpreting the first sentence of this Description section as a promise by AT&T to recover no more than the amount of its USF contribution from its residential consumers. *See* Maj. Op. at 33–34; *see also* Aplt. App. at 1607 (interpreting this sentence "unambiguously [to] provide[] that AT&T could 'recover amounts that AT&T must pay' into the USF program, and no more").

### 1. Incorporation by Reference

As an initial matter, the CSA incorporates by reference the Description section of the CSG. In pertinent part, the CSA provides that

> "AT&T Service Guides" contain the specific prices and charges, service descriptions and other terms and conditions not set forth here that apply to each of your Services. . . . THIS AGREEMENT INCORPORATES BY REFERENCE THE PRICES, CHARGES, TERMS AND CONDITIONS INCLUDED IN THE AT&T SERVICE GUIDES.

Aplt. App. at 1649.

Although AT&T insists that the CSA does not incorporate the Description section, I agree with the majority that this argument is unpersuasive. There are several reasons. First, the incorporation clause

-9-

specifically includes "terms and conditions" of the CSG. *Id.* Even though AT&T correctly notes that the CSG has a specific subsection entitled "Terms and Conditions," the CSA broadly construes the phrase "terms and conditions." The CSA notes that the CSG "contain[s] the specific prices and charges, service descriptions and *other* terms and conditions." *Id.* (emphasis added). This provision implicitly suggests that the phrase "terms and conditions" encompasses more than the expressly designated "terms and conditions" and extends to include descriptive language as well. Second, the merger clause provides that the CSA "incorporates by reference the AT&T Service Guides," without carving out any particular portions of the CSG. *Id.* at 1653. Third, the CSA incorporates by reference the Description section because the CSG must be interpreted as a whole, including the descriptions of any terms, under basic principles of contractual interpretation. *See IDT Corp.*, 918 N.E.2d at 916; *see also* Restatement (Second) of Contracts § 202(2) (1981); 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 32:5 (4th ed. 1999 & Supp. 2010); 5 Margaret N. Kniffin, Corbin on Contracts § 24.21 (Rev. ed. 1998). Fourth, the CSG itself provides that "AT&T Service Guides are . . . part of the AT&T Consumer Services Agreement." Aplt. App. at 1665, 1666. Finally, AT&T conceded that the CSA incorporated the CSG by reference at oral argument and before the district court.

### 2. Prefatory Language

Even though the CSA incorporated the CSG's Description section by reference, the majority's interpretation is untenable because the first sentence of the Description section is unenforceable prefatory language. Under New York law, prefatory language to a contract is not part of the operative agreement. *See, e.g.*, *Burr v. Am. Spiral Spring Butt Co.*, 81 N.Y. 175, 178 (1880) ("Recitals in a contract are not strictly any part of the contract . . . ."); *Jones Apparel Group, Inc. v. Polo Ralph Lauren Corp.*, 791 N.Y.S.2d 409, 410 (N.Y. App. Div. 2005) ("[R]ecitals . . . are not part of the operative agreement."); *Ross v. Ross*, 253 N.Y.S. 871, 882 (N.Y. App. Div. 1931) ("The recitals in a contract form no part thereof . . . ."), *aff'd sub nom.*, *Hutchison v. Ross*, 187 N.E. 65 (N.Y. 1933). Courts have treated clauses that are analogous to the Description language at issue here as the functional equivalents of recitals. *See, e.g.*, *United States v. Hamdi*, 432 F.3d 115, 123 (2d Cir. 2005) (Sotomayor, J.) (finding that the introductory section of a plea agreement was a "general prefatory statement," even though it used a promissory phrase); *Olander v. State Farm Mut. Auto. Ins. Co.*, 317 F.3d 807, 811 (8th Cir. 2003) (finding that hortatory language in the preamble to an agreement was effectively a recital); *Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001) (finding that a "Purpose of the Plan" provision of a contract "is analogous . . . to a contract's 'whereas'

clause"); *Devan Motors of Fairfield, Inc. v. Infiniti Div. of Nissan N. Am., Inc.*, 579 F. Supp. 2d 294, 313 (D. Conn. 2008) ("The description of a contract's purposes is analogous to a 'whereas' clause."); *Sengillo v. Valeo Elec. Sys., Inc.*, 536 F. Supp. 2d 310, 312 (W.D.N.Y. 2008) (noting that, under New York law, a clause "which is functionally a recital does not, 'by any other name,' or even in the absence of a clarifying heading, comprise an enforceable contractual term"), *aff'd*, 328 F. App'x 39 (2d Cir. 2009).

The enforceability of prefatory language depends on whether it serves an operative purpose. In general, prefatory language merely provides context to explain the purpose of the agreement. *See, e.g.*, *Ross*, 253 N.Y.S. at 882 (stating that recitals "at most indicate . . . the purposes and motives of the parties"); *see also* Black's Law Dictionary 1385 (9th ed. 2009) (defining the term "recital," or "whereas clause," to mean "[a] preliminary statement in a contract . . . explaining the reasons for entering into it or the background of the transaction, or showing the existence of particular facts"). "Although a statement in a 'whereas' clause may be useful in interpreting an ambiguous operative clause in a contract, it cannot create any right beyond those arising from the operative terms of the document." *Grand Manor Health Related Facility, Inc. v. Hamilton Equities, Inc.*, 885 N.Y.S.2d 255, 256 (N.Y. App. Div. 2009); *see Trump Vill. Section 3, Inc. v. N.Y. State Hous. Fin. Agency*, 739 N.Y.S.2d 37, 38 (N.Y. App. Div. 2002) (holding

that the recital clause did not "impose contractual obligations . . . beyond those specifically set forth in the contract"); *Musman v. Modern Deb, Inc.*, 392 N.Y.S.2d 24, 26 (N.Y. App. Div. 1977) ("Where a recital clause and an operative clause are inconsistent, the operative clause if unambiguous, should prevail.").

In this action, the first sentence of the Description section is prefatory language to the specific terms of the CSG. The majority insists that this sentence is an operative contract term. *See* Maj. Op. at 30–33. However, this sentence merely defines the UCC as "a monthly charge to Customers to recover amounts AT&T must pay into a federal program called the Universal Service Fund (USF)." Aplt. App. at 1665. This sentence explains that the purpose of the UCC is to enable AT&T to recover its USF contributions through the specific amounts collected under the Rates and Charges section of the CSG. It has no operative contractual effect.

### 3. No Promise

The first sentence of the Description section also contains no evidence of a promise. Under New York law, "[a] promise is 'a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.'" *Merritt Hill Vineyards, Inc. v. Windy Heights Vineyards, Inc.*, 460 N.E.2d

-13-

1077, 1081 (N.Y. 1984) (quoting Restatement (Second) of Contracts § 2(1) (1981)).

In this action, the first sentence of the Description section is not a promise for at least three reasons.[6]  First, this sentence does not express a manifestation of AT&T's intent to act in a specified way.  The first sentence provides that the UCC "is a monthly charge to Customers to recover amounts AT&T must pay into a federal program called the Universal Service Fund (USF)."  Aplt. App. at 1665.  As discussed *supra* Part I.C.2,

---

[6]       AT&T also argues that the Description section is not a promise because "the description was . . . required by the FCC's regulations."  Aplt. Opening Br. at 33 (arguing that the FCC's regulations "mandate that all telephone charges . . . 'be accompanied' by a 'plain language description of the service or services rendered'"); *accord id.* at 34, 39; Aplt. Reply Br. at 9.  This argument is not entirely accurate.  At all times relevant to this class action, the FCC required "[c]harges contained *on telephone bills* [to] be accompanied by a brief, clear, non-misleading, plain language description of the service or services rendered." 47 C.F.R. § 64.2401(b) (emphasis added); *see Report and Order*, 12 FCC Rcd. at 9212 ¶ 855 ("[I]f [universal service] contributors . . . choose to pass through part of their contributions *and to specify that fact on customers' bills*, contributors must be careful to convey information in a manner . . . that accurately describes the nature of the charge." (emphasis added)).  But the truth-in-billing requirement applies only to customer bills and not to service agreements.

Even though the truth-in-billing requirement does not apply to service agreements, this argument supports my interpretation of the CSA and CSG. Courts have found that declarative statements are not promises when they respond to suggestions of governmental entities.  *Cf. Hamdi*, 432 F.3d at 125.  The Description section is just that type of language because—although not required by the FCC—it responds to the FCC's concern that telecommunications providers accurately describe their charges to consumers.  *Report and Order*, 12 FCC Rcd. at 9211 ¶ 855 (indicating that consumers should receive "complete information regarding the nature of the universal service contribution").

-14-

this sentence is merely a declarative statement explaining the nature and purpose of the UCC. *See Hamdi*, 432 F.3d at 124. This sentence also contains no indication that AT&T would limit its recovery to the USF contributions attributable to residential consumers, would recover USF contributions only for a particular time period, would not overcollect its USF contribution in any given period of time, or would refund any overcollections. In short, this sentence lacks the specificity to constitute a promise.

Second, this sentence lacks any promissory language directed to the California residential consumers. *See Merritt Hill Vineyards*, 460 N.E.2d at 1081 (stating that contractual language was not a promise because "[n]o words of promise [we]re employed"); *see also Hamdi*, 432 F.3d at 123 (finding that the preliminary language in a plea agreement was not a promise, even though it used the word "agree," because the following numbered paragraphs contained "specific covenants and promises prefaced by . . . promissory phrases"). In particular, the first sentence of the Description section contains no words, such as "agree," "will," or "shall," which are evident in other promises in the CSA and CSG.[7] *See, e.g.*, Aplt. App. at 1649 ("You agree to pay us for the Services at the prices and

---

[7] Although the first sentence does note that AT&T "must pay" the USF, Aplt. App. at 1665, this promise is not directed at the California residential consumers.

-15-

charges listed in the AT&T Service Guides."). Although the specific UCC in the Rates and Charges section likewise lacks any promissory language, the CSA uses promissory language that encompasses the specific UCC. *See id.* at 1650 ("You must pay all . . . charges that we bill you for the Services . . . ."). In the absence of such promissory language, the first sentence of the Description section is not a promise.

Third, the context of the Description section confirms that the first sentence is not a promise. For example, the second and third sentences further describe the nature and purpose of the USF. *Id.* at 1665 ("The USF helps provide affordable telecommunications services for low-income customers and customers in rural areas. It also provides discounts on Internet access for eligible schools, libraries and rural health care providers."). This background information identifies the programs and beneficiaries of universal service support. The California residential consumers even concede that these two sentences are not independent promises.

Although the majority believes that the final sentence undermines the argument that the first sentence is not a promise, Maj. Op. at 31 n.6, the final sentence actually supports the notion that the first sentence is prefatory language. In the final sentence, AT&T provides that it "will revise the Universal Connectivity Charge if the method and/or amount of its required

-16-

contribution to the USF changes." Aplt. App. at 1665. Assuming, *arguendo*, that this sentence constitutes a promise because of its use of the word "will," it only highlights the absence of such promissory language in the first sentence.

Based on this interpretation, the first sentence of the Description section is not an enforceable provision of the contract because it creates no rights beyond the operative terms of the CSA and CSG. Thus, because the California residential consumers may not base their breach-of-contract claim on prefatory language, this claim fails as a matter of law.

### D.     Basic Principles of Contractual Interpretation

Even assuming, *arguendo*, that the first sentence of the Description section constitutes a promise to recover the amount AT&T must pay to the USF, the majority's interpretation of the CSA and CSG is still flawed. In particular, the majority's decision conflicts with basic principles of contractual interpretation because it (1) fails to give specific terms greater weight than general language, (2) adds terms to the description of the UCC, and (3) reaches a conclusion that is absurd, commercially unreasonable, and contrary to reasonable expectations.[8]

---

[8]     We need not reach AT&T's argument that the district court erred by converting the CSA from an individual agreement with each residential consumer into an agreement with a class of residential consumers. Although AT&T advanced the same general theory in its motions for judgment as a matter of law before the district court, Aplt. App. at 1202 (challenging "plaintiffs' attempt to

(continued...)

-17-

## 1.    Specific Contractual Terms

Under New York law, a basic principle of contractual interpretation is that specific terms override general language. *See, e.g.*, *Bowmer v. Bowmer*, 406 N.E.2d 760, 762 (N.Y. 1980); *accord John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983) ("New York law recognizes that definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary."); *see also* Restatement (Second) of Contracts § 203 (1981) ("In the interpretation of a promise or agreement or a term thereof, . . . specific terms and exact terms are given greater weight than general language."). If the general and specific provisions are inconsistent, "the specific provision controls." *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956); *accord Aguirre v. City of New York*, 625 N.Y.S.2d 597, 598 (N.Y. App. Div. 1995); *see also* 11 Williston & Lord, *supra*, § 32:10 ("Where general and specific clauses conflict, the specific clause governs the meaning of the contract."); 5 Kniffin, *supra*, § 24.23 ("If the apparent inconsistency is between a clause that is general and broadly inclusive in nature and one that is more limited and specific in its coverage,

---

[8](...continued)
transform an individual obligation . . . into a promise about AT&T's aggregate collection efforts"); *id.* at 1274 (same), its appeal focuses on new arguments. Thus, I agree with the majority that AT&T forfeited this issue by failing to raise it before the district court. *See* Maj. Op. at 38 n.11.

the more specific term should usually be held to prevail over the more general term."); *cf. Israel v. Chabra*, 906 N.E.2d 374, 380 n.3 (N.Y. 2009) (noting that "'the more specific clause controls the more general,'" if the contractual provisions are irreconcilable) (quoting 11 Williston & Lord, *supra*, § 32:15).

In this action, the specific terms of the Rates and Charges section override the general language of the Description section. The Rates and Charges section prescribes that the UCC is a specific percentage of the consumer's interstate and international bill. *See, e.g.*, Aplt. App. at 1666. By contrast, to the extent the Description section is a promise, it uses general language to limit the UCC to the amount that AT&T must pay into the USF. *Id.* at 1665. Although the sections address the same subject matter, *viz.*, the amount of the UCC rate, they are inconsistent because they provide different methodologies to calculate the UCC. Thus, the specific terms of the Rates and Charges section trump the broad language of the Description section.

The majority claims that it has not violated this principle because its interpretation reconciles these two sections. Maj. Op. at 35–36. Under New York law, we must interpret a contract "so as to give full meaning and effect to the material provisions." *Excess Ins. Co. v. Factory Mut. Ins. Co.*, 822 N.E.2d 768, 771 (N.Y. 2004); *accord Beal Savings Bank v. Sommer*, 865

-19-

N.E.2d 1210, 1213 (N.Y. 2007) ("A reading of the contract should not render any portion meaningless."); *see also* Restatement (Second) of Contracts § 203(a) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."). The majority interprets the Description section to require AT&T to "limit its UCC collections to amounts it was required to pay into the USF" and to "provide[] a mechanism for changing this rate." Maj. Op. at 35. On the other hand, the majority interprets the Rates and Charges section simply to "define[] the mechanism for collecting funds." *Id.* at 36. Thus, the majority concludes that these two sections are not irreconcilable because they impose separate obligations.

The majority errs because, in "giv[ing] full meaning and effect" to all of the provisions, it fails to give the specific term greater weight than the general language. Under New York law, if the specific and general provisions of a contract are reconcilable, "the specific provisions tend to restrict the general." *Bowmer*, 406 N.E.2d at 762; *accord Muzak Corp.*, 133 N.E.2d at 690 (holding that the specific provision trumped the general provision, even in the absence of any inconsistency between those provisions); *accord Aramony*, 254 F.3d at 413–14; *see OBG Tech. Servs., Inc. v. Northrup Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d

490, 515 (D. Conn. 2007) (applying New York law); *see also* 11 Williston &

Lord, *supra*, § 32:10 ("Even absent a true conflict, specific words will limit

the meaning of general words if it appears from the whole agreement that

the parties' purpose was directed solely toward the matter to which the

specific words or clause relate."). In direct contrast to this basic principle,

the majority seeks to harmonize these provisions by giving greater weight to

the *general language* and finding that AT&T would be in breach of the

CSA, even though it charged the specific UCC listed in the CSG.[9]

### 2.    Added Terms

Under New York law, "courts may not by construction add or excise

terms, nor distort the meaning of those used and thereby make a new

contract for the parties under the guise of interpreting the writing."

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 892 N.Y.S.2d

303, 307 (N.Y. 2009) (internal quotation marks omitted). "[C]ourts should

---

[9]    A more logical interpretation of the CSG would be to recognize that the specific UCC in the Rates and Charges section restricts or qualifies the meaning of any general promises in the Description section. *See Bowmer*, 406 N.E.2d at 762. This interpretation would give effect to AT&T's specific promise to charge a UCC based on a certain percentage of the consumer's total interstate and international bill. This interpretation also would give effect to AT&T's general promise in the Description section (assuming that it can be viewed as such) because it (1) would qualify the promise to collect only those amounts AT&T contributes to the USF by requiring only that AT&T *attempt to* balance the UCC collections against its USF contributions; and (2) would enable AT&T to amend the UCC calculation methodology, which is necessary to ensure that it collects enough to pay the fluctuating USF contribution and complies with the requirement to impose "just and reasonable" charges under 47 U.S.C. § 201(b).

be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004) (internal quotation marks omitted).

In this action, the district court improperly added material terms to the description of the UCC that altered the agreement of the parties. First, the district court concluded "as a matter of law that the contract unambiguously provides that AT&T could recover amounts AT&T must pay into the USF program, *and no more*." Aplt. App. at 1607 (emphasis added) (internal quotation marks omitted). The district court indisputably added the phrase "and no more" when interpreting the CSA and the CSG. Although the majority claims that this phrase "merely emphasized the operative promise" to "collect via the UCC charge those amounts 'it must pay' into the USF," Maj. Op. at 34, this addition artificially eliminated AT&T's flexibility under § 201(b) to collect a reasonable amount—an amount that could be more or less than its USF contribution in any given time period. A concession of this magnitude would certainly have produced more fanfare than is evident from the first sentence of the Description section.

Second, the district court implied that AT&T had promised to balance the UCC amounts it recovered with the amounts it was required to pay "over a reasonable period of time." Aplt. App. at 1614. The district court claimed

that it could imply a reasonable time of performance because "not all terms of a contract need be fixed with absolute certainty." *Id.* at 1613 (quoting *Express Indus. & Terminal Corp. v. New York State Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999)). The district court interpreted this "reasonable period of time" to consist of "a period of many billing cycles."[10] *Id.* at 1614.

Under New York law, in certain situations, courts may supply a reasonable term to a contract. "What constitutes a reasonable time . . . depends upon the facts and circumstances of the particular case." *Savasta v. 470 Newport Assocs.*, 623 N.E.2d 1171, 1172 (N.Y. 1993). Courts typically supply a reasonable time period if the contractual performance was inordinately delayed or the purpose of the contract suggests a reasonable time frame. *See, e.g.*, *id.* at 1172–73 (holding that a twenty-two month delay in providing notice of the termination of the partnership was unreasonable); *Haines v. City of New York*, 364 N.E.2d 820, 822–23 (N.Y.

---

[10] Nothing in the CSA or surrounding circumstances indicates that the parties agreed to a term of "many billing cycles," as opposed to some other period of time. In fact, the California residential consumers admit that "a[ny] defined period" could potentially constitute a reasonable period. Aplee. Opening Br. at 59. This ambiguity demonstrates that the parties never agreed on a particular time period over which to balance the collected UCC with AT&T's USF contributions. *See* Restatement (Second) of Contracts § 204 cmt. c (1981) ("Where there is tacit agreement or a common tacit assumption or where a term can be supplied by logical deduction from agreed terms and the circumstances, interpretation may be enough. But interpretation may result in the conclusion that there was in fact no agreement on a particular point, and that conclusion should be accepted . . . .").

1977) (viewing the surrounding circumstances, in a case involving the maintenance of a sewage disposal facility, and inferring that a reasonable period of time was the length of time that the city needed or desired the water treated at that facility). It is patent that neither circumstance is present here: there is no issue of inordinate delay and the overarching telephone-service purpose of the contracts tells us nothing about the possible nature of any reasonable period for effecting a "true-up" of UCC charges—why "many billing cycles," as opposed to a day, week, month, quarter, year, or the duration of an individual consumer's contract? And, on this record, I can discern no reason why it would be appropriate to move beyond these typical scenarios where the courts have employed reasonable-time-period inferences. Therefore even assuming, *arguendo*, that AT&T had promised to balance the UCC amounts it recovered with its USF contributions, the district court erred by reading into the contracts a reasonable time period by which AT&T was obliged to effectuate that balancing.

### 3.    Absurd Results

"A contract should not be interpreted to produce a result that is absurd, commercially unreasonable[,] or contrary to the reasonable expectations of the parties." *Lipper Holdings, LLC v. Trident Holdings, LLC*, 766 N.Y.S.2d 561, 562 (N.Y. App. Div. 2003) (citations omitted);

-24-

*accord Fresh Del Monte Produce N.V. v. Eastbrook Caribe A.V.V.*, 836 N.Y.S.2d 160, 164 (N.Y. App. Div. 2007) ("[A] 'strange, unnatural and unreasonable reading of the contract' should be avoided.") (citation omitted) (quoting *Fleischmann v. Furgueson*, 119 N.E. 400, 402 (N.Y. 1918)).

In this action, the majority interpreted the first sentence of the Description section as a promise to "'recover amounts AT&T must pay' into the USF program, and no more." *See, e.g.*, Maj. Op. at 33. This interpretation would lead to absurd results because AT&T could not reasonably set a UCC that would recover the exact amount of its USF contribution, given the fluctuations inherent in the calculation of its contribution based on historical revenues. *See Report and Order II*, 17 FCC Rcd. at 24969 ¶ 30 (noting that, during the relevant time period, "contributions [we]re assessed on revenues from six months prior"); *see also* Aplt. Br. at 13 (stating that in light of the operative contribution methodology AT&T "would need to charge its customers a USF percentage rate that (on average) was significantly higher than the contribution factor in order to recover the amount of the tax [i.e., the USF contribution]" (emphasis omitted) (citing Aplt. App. at 757)).

Although the district court suggested that AT&T could refund excess UCC collections or undercollect the UCC from its consumers, neither of these alternatives was reasonably contemplated by the parties in the CSA or

the CSG. To the contrary, other provisions of the CSA and CSG specifically grant consumers a credit allowance for interrupted service, indicating that AT&T knew how to provide refunds for overcharged services and did not intend to do so here. *See* Aplt. App. at 866, 1652. The absence of a "true-up" mechanism or similar provision in the CSG likewise suggests that AT&T assumed no obligation to refund any alleged overpayments of the UCC. Furthermore, the district court's proposal that AT&T habitually undercollect the UCC is unreasonable. As discussed *supra* note 5, AT&T was under no regulatory obligation to recover the exact amount of its USF contributions, "and no more," because the FCC merely prohibits telecommunications providers from assessing "unreasonable and unjust" charges and from "shift[ing] more than an equitable share of USF contributions to any customer or group of customers." Thus, the majority's interpretation would not yield a commercially reasonable result or a result that complies with the reasonable expectations of the parties.

## II. Conclusion

For the aforementioned reasons, I respectfully concur in part and dissent in part. I concur as to the majority's conclusions regarding preemption and the business consumers' breach-of-contract claim. I am constrained to dissent, however, as to the majority's conclusions regarding the California residential consumers' breach-of-contract claim. Based on

my interpretation of the CSA and the CSG, I find no evidence or reasonable inference showing that AT&T breached the contract by imposing the UCC on the California residential consumers. Based on these conclusions, I would remand this matter to the district court and direct it to enter judgment in favor of AT&T as a matter of law on the California residential consumers' breach-of-contract claim.

09-3059 & 09-3077, *Universal Service Fund Telephone Billing Practices Litigation v. AT&T Corp.*

**POLLAK**, *District Judge*, dissenting in part.

I dissent in part because I cannot conclude, as the court does, that the Federal Communications Act (FCA) contains a preemptive uniformity principle that could apply to a detarriffed market. The court acknowledges that "[t]he precise scope of the uniformity principle set out in §§ 201 and 202, however, is more difficult to ascertain than the scope of the filed-rate doctrine . . . ." There is a reason that the scope of the doctrine cannot be ascertained. Detariffed markets are inherently disuniform. In such an environment, a "uniformity principle" is inherently unworkable.

The precedents that the court invokes to corroborate its interpretation of the FCA focused on the fact that, despite the absence of tariffs, carriers could only charge a single lawful rate, even if that rate was not published via tariff. *See W. Union Tel. Co. v. Esteve Bros. & Co.*, 256 U.S. 566, 573 (1921) ("Since any deviation from the lawful rate would involve either an undue preference or an unjust discrimination, a rate lawfully established must apply equally to all, whether there is knowledge of it or not."); *cf. Postal Tel.-Cable Co. v. Warren-Godwin Lumber Co.*, 251 U.S. 27, 31 (1919) (relying on field preemption to prevent application of state law, whereas the majority here relies on conflict preemption).

In the current regulatory environment, charging different rates to customers may be lawful so long as such rates are not unreasonably discriminatory. The FCC has abandoned any interpretation of §§ 201 and 202 that would mandate a single lawful rate, as the cases the court relies upon conclude. *See Orloff v. FCC*, 352 F.3d 415, 420 (D.C. Cir. 2003) ("Orloff is therefore not entitled to prevail merely by showing that she did not receive all the sales concessions Verizon gave to some other customers - that, in other words, Verizon engaged in discrimination. Verizon may still show that the difference in treatment was reasonable."). The FCC has not only abandoned the tariff requirement of § 203, but also the requirement of § 1-3 of the Interstate Commerce Act mandating uniformity via a single lawful rate.

In a detarriffed environment telecom companies must instead (1) avoid charging rates that are "unjust or unreasonable" and (2) not engage in "unreasonable discrimination." Under the court's reasoning, §§ 201's and 202's uniformity principle should require a single lawful rate. However, there is no reason to limit this principle to policing the conduct of state governments, as the cases cited by the court have applied it to private entities as well. To do otherwise implies that the actions of numerous telecom companies entering into different terms in order to maximize profit does not result in disuniformity, but that the efforts of fifty state

governments to protect consumers located within their borders constitutes unreasonable discrimination that must be stopped in the name of uniformity of already disuniform rates. Such a result shows the dissonance needed to come to the conclusion that any uniformity principle remains.

Lastly, the uniformity principle cannot be derived from FCC regulations. The court derives more from the FCC's order on reconsideration than is clear from the text of the order. The court assumes that the FCC was stating its position on preemption under the FCA. However, the order on reconsideration might described, at best, as nebulous in regard to the extent of preemption. In response to a question about preemption, the FCC stated that "the Communications Act continues to govern determinations as to whether rates, terms, and conditions for interstate, domestic, interexchange services are just and reasonable, and are not unjustly or unreasonably discriminatory." 12 FCC Rcd. 15014, 15056 (F.C.C. 1997). In that very same paragraph the order states that "[a]s stated in the Second Report and Order, consumers may have remedies under state consumer protection and contract laws as to issues regarding the legal relationship between the carrier and customer in a detariffed regime." *Id.* Later, in the same document, the FCC further states "[w]e also observed that eliminating the ability of carriers to invoke the 'filed-rate' doctrine benefits consumers by creating a legal relationship that more closely

resembles the legal relationship between service providers and customers in an unregulated environment." *Id.* at 15058. There is no dispute that the FCA governs, but federal law can apply without displacing state law, as is the normal situation in an environment without tariffing. In my view, the FCC has been manifestly ambiguous as to the extent of preemption.

Even if the FCC's recital is read as concluding that state law is preempted, for that conclusion to merit a measure of deference it is not enough that the FCC's mode of arriving at its decision was, as the court suggests, free of "procedural errors." There is a further requirement. The Supreme Court has been at pains to point out that "[t]he weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness." *Wyeth v. Levine*, 129 S. Ct. 1187, 1201 (2009). I do not find the brief statement in the order on reconsideration to be thorough, consistent, or persuasive, given that the FCC has abandoned uniform rates in favor of enforcing an "unreasonable discrimination" requirement.